## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SHALONYA KYLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-cv-1572 (KBJ) |
| | ) | |
| DUNCAN BEDLION, DIANE DAVIS, | ) | |
| ANDREW GAMM, BENJAMIN RUBIN, | ) | |
| AND RONALD WRIGHT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### <u>MEMORANDUM OPINION</u>

Plaintiff Shalonya Kyle is suing Sergeant Duncan Bedlion and four other officers of the District of Columbia Metropolitan Police Department because of their actions during and after a dispute at a party that she and her boyfriend attended in September of 2011.  Kyle asserts that, when the officers arrived to respond to a noise complaint, a confrontation between her boyfriend and the officers ensued, and when she attempted to defuse the brewing altercation, Sergeant Bedlion pushed her into a hot barbeque grill and ordered another officer to arrest her.  In the instant eight-count complaint, Kyle has brought various common-law tort claims, including assault and battery, negligence, and abuse of process, and she also alleges that the officers violated federal law—specifically, 42 U.S.C. § 1983—when, among other things, they falsely arrested her and used excessive force against her in violation of her Fourth and/or Fifth Amendment rights.

Before this Court at present is Defendants' motion for summary judgment, which argues that the officers are entitled to immunity for the alleged violations of Kyle's constitutional rights.  As explained fully below, this Court concludes that, even assuming *arguendo* that the officers' treatment of Kyle transgressed the Constitution, the officers are entitled to qualified immunity because clearly established law did not prohibit Bedlion's use of force or Kyle's arrest as the facts presented themselves here (even when the facts are viewed in the light most favorable to Kyle).  And because this Court has determined that Kyle's federal claims cannot proceed, it will decline to exercise jurisdiction over Kyle's pendent state-law tort claims.

Accordingly, Defendants' motion for summary judgment will be **GRANTED** with respect to Counts Six and Seven of Kyle's complaint, and the remaining claims will be **DISMISSED**.  A separate order consistent with this memorandum opinion will issue concurrently.

## I.   BACKGROUND

### A.   The Facts Pertaining To The Officers' Handling And Arrest Of Kyle

The relevant facts, which have been construed as much as reasonably possible in Kyle's favor, are largely undisputed and are as follows.[1]

---

[1] Kyle has failed to adhere to the local rule that requires a non-movant facing a summary-judgment motion to append "a separate concise statement of genuine issues" of material fact, with record references and citations.  LCvR 7(h)(1).  Thus, this Court "may" deem undisputed the facts that Defendants have identified, *see Bruder v. Chu*, 953 F. Supp. 2d 234, 236 (D.D.C. 2013) (citation omitted); however, the Court may also decline to find that Kyle has conceded facts that appear to be plainly disputed in light of the record and the colloquy between the parties.  *See Robinson v. District of Columbia*, No. 09-2294, 2015 WL 5442434, at *3–4 (D.D.C. Sept. 15, 2015) (declining to treat defendants' undisputed statement of material facts as completely conceded and examining facts in the record where plaintiff had included statements of facts in her briefs and noted record conflicts); *Matthews v. District of Columbia*, 924 F. Supp. 2d 115, 117 n.2 (D.D.C. 2013) (same).  Given that the Court must "draw reasonable inferences in the light most favorable" to the non-movant, *Fenwick v. Pudimott*, 778 F.3d 133, 137 (D.C. Cir. 2015) (citation omitted), it is reluctant to construe Kyle's apparently inadvertent omission of a statement of facts as a relinquishment of her entitlement to the

On the evening of September 11, 2011, Sergeant Duncan Bedlion and Officer Diane Davis arrived at a party in the northeast quadrant of the District of Columbia in response to a complaint about the noise level; they were joined shortly thereafter by Officer Andrew Gamm.  (*See* Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. ("Undisputed Facts"), ECF No. 51, 37–39, ¶¶ 1–3.)  During the course of the officers' investigation, they entered the home, where Kyle was sitting on a couch with her boyfriend Darious Lewis.  (*See* Excerpts From Kyle's Trial Testimony ("Kyle's Trial Testimony"), Ex. 1 to Defs.' Mot. for Summ. J., ECF No. 51-1, at 6–7.)[2]  Some sort of confrontation ensued between the officers and another person in the home, and Lewis got up from the couch to try to exit, but the officers stopped him in the doorway.  (*See* Kyle's Deposition, Ex. 1 to Defs.' Reply, ECF No. 55-1, at 13–14.)  Bedlion and Lewis then began to argue on the home's front porch.  (*See* Undisputed Facts ¶¶ 5–6; Kyle's Deposition at 14.)  During this argument, Kyle stepped between the two men, with her back to Bedlion (*see* Undisputed Facts ¶¶ 7, 12), grabbed Lewis's waist (Kyle's Deposition at 15), and placed her hand over Lewis's mouth (*id.*; Undisputed Facts ¶ 7).  Kyle never touched the officer.  (*See* Superior Court Trial Transcript, Ex. 1 to Defs.' Mot. for Partial Summ. J., ECF No. 38-1, at 45.)

The argument escalated; at one point, Bedlion grabbed Lewis by the arm and Lewis pulled away, cursing at Bedlion.  (*See* Undisputed Facts ¶¶ 8–11.)   Bedlion then

---

benefit of such inferences.  Therefore, while this Court will view Defendants' statement of undisputed material facts as generally admitted (*see generally* Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. ("Undisputed Facts"), ECF No. 51, 37–39), and will not sift through the record to ascertain controverted facts on Kyle's behalf, it will not accept any characterizations that are obviously belied by the record or that contravene summary-judgment principles.

[2] Page-number citations to the documents the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

immediately fired his pepper spray at Lewis (*see* Kyle's Deposition at 16), while Kyle was still between the two men (*see* Undisputed Facts ¶¶ 12–13).  Kyle and Lewis stumbled away and "tumbl[ed] down the steps" to the porch, with Kyle still holding on to Lewis.  (Kyle's Trial Testimony at 4; *see also* Undisputed Facts ¶ 14.)  Bedlion followed behind them, and then grabbed and threw (or shoved) Kyle away from Lewis—Kyle landed in a hot barbeque grill about six feet away.  (*See* Kyle's Trial Testimony at 4 ("The police officer . . . placed [his] hands on my arms and just tossed me away into the grill."); Undisputed Facts ¶ 15.)  Kyle sustained a second-degree burn on her arm (Kyle's Trial Testimony at 4), and Officer Davis, who had been in her police car up until that point, came over to assist Kyle, (*see* Undisputed Facts ¶ 19).  Davis helped Kyle up from the ground and told her to go inside and sit down, but Bedlion overruled this directive, ordering Davis to arrest Kyle.  (*See* Kyle's Deposition at 20 ("[B]y the time I reached the top of the steps a male officer said, 'No, arrest her, too.'"); *see also* Undisputed Facts ¶¶ 19–21.)

### B.  Procedural History

Following the arrest, Kyle was charged in Superior Court with two counts of assault on a police officer ("APO") under D.C. law.  (*See* Superior Court Trial Transcript at 95–96); *see also* D.C. Code § 22-405(b) (making it unlawful to "without justifiable and excusable cause, assault[], resist[], oppose[], impede[], intimidate[], or interfere[] with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties").[3]  Lewis had also been arrested for APO, and both defendants went to trial.  In April of 2012, Kyle was

---

[3] Like the parties, the Court cites to the current version because the operative language has not changed since the events in question.

found not guilty on both APO counts (*see* Superior Court Trial Transcript at 96), while

Lewis, who was tried separately, was found guilty of this offense (*see generally*

Darious Lewis Docket Sheet, Ex. 5 to Defs.' Mot. for Summ. J., ECF No. 51-5).

After her acquittal, on September 21, 2012, Kyle filed the instant lawsuit against

Bedlion, Davis, Gamm, and two other officers, Benjamin Rubin and Ronald Wright,

who were involved at later stages of her arrest and prosecution.  (*See generally* Compl.

("Initial Compl."), ECF No. 1.)  Kyle subsequently amended her complaint (*see* Am.

Compl. ("Compl."), ECF No. 13), to bring eight claims: (1) False arrest/false

imprisonment under D.C. law against Bedlion, Davis, Gamm, and Rubin (Count One);

(2) assault and battery under D.C. law against Bedlion (Count Two); (3) negligence

under D.C. law against Bedlion, Davis, Gamm, Rubin, and Wright (Count Three);

(4) abuse of process under D.C. law against Bedlion, Davis, Gamm, and Rubin (Count

Four); (5) defamation under D.C. law against Bedlion, Davis, Gamm, and Rubin (Count

Five); (6) unreasonable seizure (through false arrest and the use of excessive force) in

violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983, against Bedlion,

Davis, Gamm, and Rubin (Count Six); (7) in the alternative to Count Six, use of

excessive force in violation of the Fifth Amendment, pursuant to 42 U.S.C. § 1983,

against Bedlion (Count Seven); and (8) violation of the First Amendment, pursuant to

42 U.S.C. § 1983, against Bedlion (Count Eight).  (*See id.* ¶¶ 96–177.)[4]

On July 23, 2014, Defendants filed an initial partial motion for summary

judgment (*see* Defs.' Mot. for Partial Summ. J., ECF No. 38); this Court denied that

---

[4] To the extent that Kyle's Count Six allegations cursorily reference "civil conspiracy" (*see* Compl. ¶ 166), the complaint is patently insufficient on that front because it fails to allege with any specificity the elements of such a claim, *see Lyles v. Hughes*, 83 F. Supp. 3d 315, 323 (D.D.C. 2015), nor does the evidence in the summary-judgment record support any such allegation.

motion without prejudice, finding that an antecedent period of discovery was necessary (*see* Mem. Op. and Order, ECF No. 45). Thereafter, the parties engaged in a full round of discovery, followed by a period of mediation. (*See* Joint Status Report, ECF No. 50, at 1.) Then, on July 31, 2015, Defendants filed the motion for summary judgment that is before this Court at present. (*See* Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. 51, at 1–4.)

In their summary-judgment motion, Defendants argue generally that they are entitled to qualified immunity against Kyle's section 1983 claims and that her state-law claims fail either because of applicable state-law privileges or because they fail to state a claim under D.C. law. (*See generally* Defs.' Mot.; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), ECF No. 51, 5–36.) For her part, Kyle's brief in opposition begins by expressly "consent[ing] to the dismissal" of several of her claims, either partially or in full; specifically, she declines to pursue Counts One and Six as to Rubin and Gamm, and Counts Three, Five, and Eight in full. (*See* Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), ECF No. 53, at 2.) With respect to the remaining claims, Kyle argues that the facts here entitle her to proceed to trial because, with respect to her section 1983 claims, she can overcome the qualified-immunity hurdle, and with respect to her state-law claims, she has stated a claim upon which relief can be granted and can prevail with respect to any applicable state-law privileges.

This Court has considered the parties' summary-judgment arguments as they pertain to the remaining contested claims—*i.e.*, the excessive-force claim brought under section 1983 against Bedlion based on the Fourth Amendment (Count Six), or alternatively, the Fifth Amendment (Count Seven); the false-arrest claim brought under

section 1983 against Bedlion and Davis based on the Fourth Amendment (also Count

Six); and the false-arrest, assault, and abuse-of-process tort claims that are based on

D.C. law, (*see* Compl. ¶¶ 96–101 (alleging false arrest and false imprisonment against

Bedlion and Davis (Count One)); *id.* ¶¶ 102–110 (claiming assault and battery against

Bedlion (Count Two)); *id.* ¶¶ 138–48 (asserting an abuse-of-process claim against

Bedlion, Davis, Rubin, and Gamm (Count Four)).  Defendants' motion for summary

judgment with respect to these claims is now ripe for this Court's review.

## II.   LEGAL STANDARDS

### A.   Qualified Immunity

Section 1983 of Title 42 of the United States Code provides for a cause of action

against any state actor (including those from the District of Columbia) who "under

color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to

be subjected, any citizen of the United States or other person within the jurisdiction

thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws[.]"  42 U.S.C. § 1983.  Thus, section 1983 permits a plaintiff who

claims that her constitutional rights have been violated to seek vindication in federal

court, and to receive money damages as relief.  *See Butera v. District of Columbia*, 235

F.3d 637, 645 (D.C. Cir. 2001).

It is well established that section 1983 permits a state actor to be held

accountable in his individual capacity for conduct that violates constitutional rights, *see*

*Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009);

however, it is also clear that immunity doctrines may apply to curtail that individual

liability.  One such doctrine is that of qualified immunity, previously commonly known

as "good-faith immunity," *see, e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982),

which shields state actors from "liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known[,]"  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (internal quotation marks and citation omitted).[5]  Put another way, qualified immunity prevents officials who violate the law from having to defend against lawsuits for money damages unless "the legal rules that were clearly established at the time [the action] was taken" gave those officials 'fair warning' that they were acting contrary to law.  *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (internal quotation marks and citation omitted); *see also Tolan*, 134 S.Ct. at 1866; *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (explaining that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and that, "[w]hen properly applied, it protects all but the plainly incompetent or those who knowingly violate the law" (internal quotation marks and citation omitted)).

A defendant bears the burden of raising the defense of qualified immunity in response to a claim brought under section 1983, *see Crawford-El v. Britton*, 523 U.S. 574, 587 (1998), and once the defense is asserted, "the burden of proof then falls to the plaintiff to show that the official is not entitled to qualified immunity."  *Winder v. Erste*, 905 F. Supp. 2d 19, 28 (D.D.C. 2012) (citation omitted); *see also Dukore v.*

---

[5] Unlike absolute immunity, which categorically immunizes certain actors for wrongful conduct, *see, e.g.*, *Burns v. Reed*, 500 U.S. 478, 484–86 (1991), "good-faith" immunity turns on whether or not the official should have known that his conduct violated the rights of the affected individuals but acted in that fashion anyway.  *See* Erwin Chemerinsky, *Federal Jurisdiction* 570 (6th ed. 2012).  This immunity is largely about how much notice the actor had that his action was wrong—an objective assessment made in light of governing legal principles at that time—and it can be lost if sufficient notice existed, *see Tolan*, 134 S. Ct. at 1866.  The label "good-faith" is synonymous with insufficient notice in this context, and should not be taken to suggest a subjective component to the qualified-immunity analysis, which the Supreme Court rejected long ago in *Harlow*, *see* 457 U.S. at 815–819.

*District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015). At the summary-judgment stage, the qualified-immunity question involves a "two-pronged inquiry." *Tolan*, 134 S. Ct. at 1865. At the first prong, the Court asks "whether the facts, [t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]" *Id.* at 1865 (alterations in original) (internal quotation marks and citation omitted). At the second, the Court looks to "the legal rules that were clearly established" at the time of the relevant action, *Messerschmidt*, 132 S. Ct. at 1245 (internal quotation marks and citation omitted), to determine whether they gave the officer "fair notice" that his conduct was contrary to law, *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) (internal quotation marks and citation omitted). These two areas of inquiry may be addressed in any order, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and an affirmative answer to both is required in order for the plaintiff to succeed at establishing that the officer is not entitled to immunity's protection.

### B.    Summary Judgment

When a defendant asserts that he or she is entitled to summary judgment on the basis of qualified immunity, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor[,]" just as with consideration of summary judgment in other contexts. *Tolan*, 134 S. Ct. at 1863 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). As always, the court's job is "not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* at 1866 (quoting *Liberty Lobby*, 477 U.S. at 249).

To decide the issue of whether or not the non-movant may survive summary judgment—*i.e.*, whether he has provided enough evidence "that a reasonable jury could

return a verdict" in his favor, *Liberty Lobby*, 477 U.S. at 248—the court must "first identify[] the version of events that best comports with the summary judgment standard and then ask[] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009) (citations omitted); *see also Tolan*, 134 S. Ct. at 1866.  This is because, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the "reasonableness of [the officer's] actions . . . is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis deleted) (citation omitted).

## III.   ANALYSIS

In her complaint, Kyle contends that Sergeant Bedlion and Officer Davis violated her constitutional rights in two ways: Bedlion allegedly used excessive force to seize her in the course of carrying out his duties (*see* Compl. ¶¶ 160–162, 168), and both Bedlion and Davis allegedly arrested her without probable cause to believe she was committing a crime (*see id.* ¶¶ 164–165).  Furthermore, she raises the excessive-force allegations against Bedlion in reference to two different constitutional provisions—the Fourth Amendment and, alternatively, the Fifth Amendment.  (*See id.* ¶¶ 158–162, 168.) As explained below, this Court concludes that the force Bedlion used on Kyle did not violate clearly established law with respect to the use of force by police officers under the Fourth Amendment, which is the only potentially cognizable constitutional provision in light of the seizure of Kyle that indisputably occurred.  Kyle's section 1983 claim based on the false-arrest allegation fares no better because, given the law regarding the commission of APO offenses at the time of the events at issue, a reasonable officer would not necessarily have known that he or she lacked probable

cause to arrest Kyle under the circumstances presented. Consequently, even if the actions of Sergeant Bedlion and Officer Davis amounted to violations of Kyle's Fourth Amendment rights, they were not clearly established violations; thus, those defendant officers are entitled to qualified immunity, and the Court must grant Defendants' motion for summary judgment with respect to Kyle's section 1983 claims. Moreover, because this determination resolves the only federal-law claims remaining in this case, this Court will decline to exercise jurisdiction over the remaining pendent state-law claims, and Kyle's entire complaint will be dismissed.

> **A.    Sergeant Bedlion Is Entitled To Qualified Immunity With Respect To Kyle's Excessive-Force Claim Because It Was Not Clearly Established That Bedlion's Use Of Force Violated Kyle's Fourth Amendment Rights**

As explained, Kyle has alleged that Sergeant Bedlion's act of grabbing her and pushing her into the hot barbeque grill was an exhibition of excessive force that violated her constitutional rights in a manner that entitles her to money damages. (*See* Compl. ¶¶ 160–61, 168.) Kyle contends that Bedlion's conduct violates the Fourth Amendment or the Fifth Amendment in the alternative, either because Bedlion used excessive force in contravention of Kyle's Fourth Amendment right to be free of unreasonable seizures, *see Graham v. Connor*, 490 U.S. 386, 394 (1989), or if his conduct did not effect a seizure, Bedlion used excessive force in contravention of her substantive-due-process rights under the Fifth Amendment, *see Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843–47 (1998). Of course, for either contention to survive summary judgment, Kyle must show that the facts regarding Bedlion's actions, when construed in her favor, could support a claim under either Fourth or Fifth Amendment principles. And the parties disagree on the applicability of either provision:

Defendants' motion for summary judgment makes clear their view that the Fourth Amendment framework is the only applicable legal analysis in light of the undisputed facts regarding Sergeant Bedlion's actions (*see* Defs.' Mem. at 10–11), while Kyle responds that it is not at all clear that the Fourth Amendment provides the pertinent legal standard, which is precisely why her complaint pleads alternative constitutional bases for the violation that she must establish (*see* Pl.'s Opp'n at 3–6).

Thus, a threshold question in this Court's analysis of whether or not Kyle has met her burden of overcoming the qualified-immunity barrier with respect to her excessive-force claim is *which* constitutional right is actually at issue based on the facts the complaint alleges and the record establishes.  For the reasons stated below, this Court concludes that the Fourth Amendment provides the exclusive frame of reference for Kyle's section 1983 claim, which means that, to defeat Bedlion's qualified-immunity contention, Kyle needs to show both (1) that Bedlion's force was unreasonable insofar as it violated the Fourth Amendment's protection against unreasonable seizures, and (2) that this alleged constitutional violation was clearly established under the law at the time of the events at issue here.  *See Saucier v. Katz*, 533 U.S. 194, 204–06 (2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  The Court will exercise its discretion to consider the second prong of the qualified-immunity analysis first, *see Pearson*, 555 U.S. at 236, and as explained in Part III.A.2, *infra*, it concludes that the law governing excessive-force claims did not put Bedlion on sufficient notice that the force he used constituted a Fourth Amendment violation, and thus, he is entitled to qualified immunity.

1.      Sergeant Bedlion's Act Of Grabbing Kyle And Pushing Her
        Into The Barbeque Grill Was A Seizure, And Thus, Only
        The Fourth Amendment Right To Be Free From
        Unreasonable Seizures Is Implicated

It is axiomatic that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing a claim." *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 541 (D.C. Cir. 2015) (internal quotation marks and citation omitted).  As pertinent here, all "claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard[.]'" *Graham*, 490 U.S. at 395; *see also Bolger v. District of Columbia*, 608 F. Supp. 2d 10, 17 n.4 (D.D.C. 2009) ("[T]he Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the process that is due for seizures of persons or property in criminal cases." (internal quotation marks omitted) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975)).  Kyle's excessive-force claim is expressly premised solely on Sergeant Bedlion's shove, not his employment of the pepper spray (*see* Compl. ¶ 161 ("Sgt. Bedlion used excessive force by seizing Ms. Kyle and throwing her into a barbeque pit.")), so the issue to be resolved in determining which constitutional provision is potentially implicated is whether that shove qualifies as a seizure.

This Court has little doubt that it does.  A seizure occurs for the purposes of the Fourth Amendment "when physical force is used to restrain movement or when a person submits to an officer's show of authority." *United States v. Brodie*, 742 F.3d 1058,

1061 (D.C. Cir. 2014) (internal quotation marks and citation omitted).  No less an
authority than the Supreme Court of the United States has made clear that a citizen is
seized through physical force "when there is a governmental termination of freedom of
movement *through means intentionally applied*[,]" *Brower v. Cty. of Inyo*, 489 U.S.
593, 596–97 (1989) (emphasis in original), and that "[w]henever an officer restrains the
freedom of a person to walk away, he has seized that person[,]" *Tennessee v. Garner*,
471 U.S. 1, 7 (1985) (citation omitted); *see also Muhammad v. District of Columbia*,
881 F. Supp. 2d 115, 120 (D.D.C. 2012) (citing *Scott*, 550 U.S. at 381) (same).
Moreover, a "seizure can be accomplished in an instant," *West v. Davis*, 767 F.3d 1063,
1070 (11th Cir. 2014) (citation omitted), and there is no minimum time that a plaintiff's
freedom of movement must be terminated in order to establish that a seizure has
occurred.  *See Brodie*, 742 F.3d at 1061 (rejecting the argument that "the short
duration" of the defendant's submission to an officer's show of authority meant that no
seizure occurred).  It is also clear that a seizure need not be in service of an arrest; that
is, a seizure for the purpose of the Fourth Amendment can occur in myriad contexts that
do not involve the arrest of the person seized.  *See, e.g.*, *Atkinson v. City of Mountain
View*, 709 F.3d 1201, 1208–09 (8th Cir. 2013) (concluding that an officer seized the
plaintiff when he shoulder checked him "ten to fifteen feet backward into the side of a
truck"); *Slusher v. Carson*, 540 F.3d 449, 452, 454–55 (6th Cir. 2008) (holding that an
officer seized the plaintiff when he momentarily grabbed her hand to retrieve a paper
she was holding); *Acevedo v. Canterbury*, 457 F.3d 721, 724–25 (7th Cir. 2006)
(explaining that an officer seized the plaintiff with a single punch that briefly knocked
him to the ground).

14

The allegations and facts relating to what happened between Sergeant Bedlion and Kyle easily fit the well-established seizure definition.  According to the complaint, Bedlion "grabbed Ms. Kyle from behind and threw her to the left" (Compl. ¶ 43); in her deposition, Kyle similarly recalled, "I just g[o]t lift[ed] up—swept off my feet and just thrown into the ground" (Kyle's Deposition at 17).  Neither party suggests that Bedlion *accidentally* shoved Kyle, and indeed, Kyle affirmed at her deposition that Bedlion grabbed her from behind "on [her] forearms" (*id.*), which is hardly indicative of an accidental action.  Volitionally grabbing and throwing an individual to the ground indisputably qualifies as termination of movement through means intentionally applied, *cf. Muhammad*, 881 F. Supp. 2d at 120–21 (indicating that this standard would apply to a claim that a police officer shoved a parade-goer), and the parties have not offered any case to the contrary.

Kyle's only apparent objection is that there is a dispute between the parties here regarding whether Bedlion shoved her in the course of arresting her, as opposed to prior to her arrest.  (*See* Pl.'s Opp'n at 6 (claiming that there "is no certainty as to whether Sgt. Bedlion threw Ms. Kyle into the barbecue during the course of her own arrest or that of Mr. Lewis")).  But even if the timing of Bedlion's shove relative to the arrest is a disputed issue in this case, that dispute is immaterial to the question of whether Bedlion's act counted as a seizure, because it is clear that one may be seized for Fourth Amendment purposes *without* being arrested.  *See Graham*, 490 U.S. at 395 (speaking of arrests, investigatory stops, "or *other* 'seizure[s]'" (emphasis added)); *Michigan v. Summers*, 452 U.S. 692, 696–97 (1981) (noting that officers seized defendant by barring him from leaving his home during a search); *see also Cavanaugh v. Woods Cross City*,

718 F.3d 1244, 1251 (10th Cir. 2013) (observing that the issue of "whether an

individual resisted *arrest* may not always" be relevant to the excessive-force inquiry

because "evading arrest is not the only instance when a seizure can be effected or force

can be used" (emphasis in original) (citation omitted)); *Howard v. Kan. City Police

Dep't*, 570 F.3d 984, 988–89 (8th Cir. 2009) (holding that officers who "pushed

[plaintiff] to the ground and restrained him on the asphalt" seized him although he was

neither suspected of a crime nor arrested and the officers had restrained him "to render

medical aid"); *Smith v. City of Hemet*, 394 F.3d 689, 700–701 (9th Cir. 2005) (en banc)

("[E]xcessive force claims arising *before or* during arrest are to be analyzed exclusively

under the [F]ourth [A]mendment's reasonableness standard[.]" (second and third

alterations in original) (emphasis added) (citation omitted)).  To Kyle's credit, there is

no question that an arrest is, by definition, one type of seizure.  *See Graham*, 490 U.S.

at 395.  But if all that mattered was whether the action in question took place during an

arrest, surely the Supreme Court would not have spent several pages in *Brower* crafting

its seizure definition in a non-arrest context.  *See* 489 U.S. at 595–99.

The bottom line is this: the allegations of Kyle's complaint and the claims she

has brought based on the record evidence relate to *how* Bedlion intentionally terminated

her freedom of movement (allegedly excessively), and thus, the Fourth Amendment

governs.  *See Scott*, 550 U.S. at 384 n.10.  As a result, there is no cognizable

substantive-due-process claim arising out of these facts, which means that Count Seven

of the complaint (the Fifth Amendment excessive-force claim) must be dismissed.[6]

---

[6] To the extent that Kyle's opposition brief suggests another basis for the Fifth Amendment substantive-due-process claim—*i.e.*, the allegation that the defendant officers fabricated evidence in violation of her Fifth Amendment rights (*see* Pl.'s Opp'n at 6–7)—this Court sees no such claim in her amended complaint, and it is clear beyond cavil that "a plaintiff may not amend her complaint by making new

2.      At The Time Of The Challenged Conduct, It Was Not
        Clearly Established That The Fourth Amendment Prohibited
        Sergeant Bedlion's Actions

Having invoked the protections of the Fourth Amendment by bringing an excessive-force claim under section 1983 based on Sergeant Bedlion's seizure, Kyle must satisfy the well-worn objective reasonableness standard in order to surmount the first part of the qualified immunity hurdle. *See Brower*, 489 U.S. at 599 ("'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'"); *see also Tolan*, 134 S. Ct. at 1866 (reiterating that, at summary judgment, the prong-one question is whether the facts construed in the light most favorable to the non-movant make out a constitutional violation). But even if Kyle managed to show that Bedlion's shove was objectively unreasonable and thus violated the Fourth Amendment based on "the facts and circumstances of [this] particular case," *Graham*, 490 U.S. at 396 (citation omitted); *see also id.* at 397 (noting that the core question in evaluating whether a Fourth Amendment violation occurred is "whether the officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them" (internal quotation marks and citation omitted)), the qualified-immunity standard adds a *second* layer of protection against officer liability. That is, in addition to showing that the facts (construed in her favor) demonstrate an objectively unreasonable seizure, Kyle must also show, in effect, that it was so clear under then-existing law that the seizure constituted a Fourth Amendment violation that only an officer who was "plainly incompetent" or "knowingly violat[ing] the law" would have effected it. *Al-Kidd*, 131 S. Ct. at 2085 (internal quotation marks and citation omitted).

---

allegations in her opposition brief." *Budik v. Ashley*, 36 F. Supp. 3d 132, 144 (D.D.C. 2014) (citing *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173–74 (D.C. Cir. 1994)).

The critical question in determining whether an officer's conduct was a "clearly established" violation of the law is "whether the state of the law at the time of an incident provided fair warning to the defendant[]" that he was acting contrary to law. *Tolan*, 134 S. Ct. at 1866 (internal quotation marks and citations omitted).  Whether or not fair warning existed "generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Messerschmidt*, 132 S. Ct. at 1245 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal quotation marks omitted)).  Notably, the Supreme Court has warned that courts may not "define clearly established law at a high level of generality"; instead, they must ask "whether the violative nature of *particular* conduct [wa]s clearly established" under the law.  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (emphasis in original) (internal quotation marks and citations omitted).

Kyle has done little to demonstrate that Bedlion's conduct violated clearly established constitutional law at the time of the events in question.  First of all, Kyle fails to cite a single Fourth Amendment excessive-force case—from this jurisdiction or elsewhere—that plainly establishes the impermissibility of Bedlion's shove.  To delineate the body of governing law that a reasonable officer should have been aware of, this Court "look[s] to cases from the Supreme Court and [the D.C. Circuit,] as well as to cases from other courts exhibiting a consensus view[,]" *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008) (citation omitted), and it is significant that, in cases involving at least somewhat similar "intrusion[s] on [an] individual's Fourth Amendment interests[,]" *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted), courts have repeatedly found that there was no Fourth Amendment

violation, after balancing that intrusion against the officer's conceded interest in effecting the seizure, *id.  See, e.g.*, *Oberwetter v. Hilliard*, 639 F.3d 545, 548, 555 (D.C. Cir. 2011) (holding there was no excessive force where an officer arrested a plaintiff who was dancing at the Jefferson Memorial by "ripping apart her earbud, shoving her against a pillar, and violently twisting her arm" (internal quotation marks and citation omitted)); *Scott v. District of Columbia*, 101 F.3d 748, 759–60 (D.C. Cir. 1996) (finding no Fourth Amendment violation where officers struck a suspect once and pinned him to the ground because their actions "were reasonably calculated toward" a reasonable, lawful goal of "securing [plaintiff] and placing him in handcuffs, while minimizing his opportunity to escape"); *Martin v. Malhoyt*, 830 F.2d 237, 261–62 (D.C. Cir. 1987) (finding no Fourth Amendment violation where an officer grabbed plaintiff arrestee, threw him into the driver's seat of a car, and slammed the door on plaintiff's leg).  And the kind of officer conduct that the Supreme Court and the D.C. Circuit *has* found to violate the Fourth Amendment rights of seized individuals generally extends well beyond the single shove that Bedlion indisputably employed to seize Kyle under the circumstances presented here.  *See, e.g.*, *Johnson*, 528 F.3d at 974–75 (denying qualified immunity to an officer who repeatedly kicked a prone surrendering suspect in his groin); *Arrington v. United States*, 473 F.3d 329, 331–33, 336–37 (D.C. Cir. 2006) (noting that there would have been a Fourth Amendment violation if, as plaintiff claimed, he had been punched, beaten with a baton, pistol-whipped, and attacked by a police dog *after* he had been disarmed and handcuffed).

To be sure, Kyle has suggested that the force used here was applied *before* Bedlion ordered her arrest (*see* Pls.' Opp'n at 6); thus, the Court will assume that the

force at issue was employed with respect to a *non-arrestee* (Kyle herself).[7]  But it is not

at all clear why the distinction between arrestee and non-arrestee matters for purposes

of demarcating the applicable Fourth Amendment standards in this circumstance, and,

regardless, it is undisputed that Bedlion was undertaking to perform an arrest (of Lewis)

at the time the allegedly excessive force was employed.  *See Graham*, 490 U.S. at 395

(observing that the Fourth Amendment's objective-reasonableness standard governs all

seizures of free citizens); *id.* at 396 (noting bedrock principle that at least some force is

permissible to effect an arrest).  Furthermore, and in any event, this Court has found no

case that would have put a reasonable officer in Bedlion's position on notice that he

could not apply the quantum of force he applied here to a non-arrestee who was

standing between him and his intended target.  *Cf. Saucier*, 533 U.S. at 209 ("[N]ot

every push or shove, even if it may later seem unnecessary in the peace of a judge's

chambers, violates the Fourth Amendment." (quoting *Graham*, 490 U.S. at 396)); *id.* at

208–09 (rejecting at prong two of qualified immunity an arrestee's claim that a single

"gratuitously violent shove" was excessive force); *compare Howard*, 570 F.3d at 988–

92 (finding that officers violated clearly established Fourth Amendment law when they

pushed a recently shot non-suspect non-arrestee plaintiff to the ground and restrained

him for seven minutes on burning asphalt, ostensibly to question him and "render

---

[7]The Court has assumed *arguendo* that Bedlion's shove occurred *before* Kyle's arrest, consistent with the mandate that the qualified-immunity question must be answered after construing the facts in accordance with the summary-judgment standard, *i.e.*, as favorably as reasonably possible to the non-movant, *see Tolan*, 134 S. Ct. at 1863, 1866.  This assumption regarding the timing of Bedlion's conduct favors Kyle, in contrast to a contention that he shoved her *while* effecting her arrest, because it is well established that the authority to arrest carries with it the right to use a reasonable amount of physical force in doing so, *see Graham*, 490 U.S. at 396; and as the Supreme Court often reiterates, "[n]ot every push or shove" by an officer in the course of an arrest violates the Fourth Amendment. *Saucier*, 533 U.S. at 209 (alteration in original) (citation omitted); *see also id.* (rejecting the plaintiff's contention that a single allegedly unnecessary shove during an arrest violated clearly established excessive-force principles).

medical aid").  In other words, Kyle's non-arrestee status, without more, does not transform Bedlion's action into a violation of clearly established law.

Notably, this is so notwithstanding the regrettable fact that Bedlion's shove actually resulted in Kyle being injured when she fell into the barbeque grill.  Kyle has not identified (and the Court has not discovered) any evidence upon which a reasonable jury could find that Bedlion *meant* to push her into the grill, or that he was even aware of the grill at the time that he administered the push.  The constitutionality prong of the qualified-immunity analysis in a Fourth Amendment case is undoubtedly premised on *intentional* conduct, *see Brower*, 489 U.S. at 596–97 (observing that the "Fourth Amendment addresses misuse of power, not the accidental effects of otherwise lawful government conduct" (internal quotation marks and citation omitted)), which makes the notice question here simply and solely whether or not Bedlion's intentional conduct—the push—violated clearly established law.  *See, e.g., Slusher*, 540 F.3d at 456 & n.4 (observing that the fact that plaintiff had a hand disorder "play[ed] no role" in determining whether an officer used excessive force in grabbing her hand because she had "presented no facts that suggest[ed that] a reasonable officer would have been aware of her disorder").  And, in this Court's judgment, it cannot be said that the state of Fourth Amendment jurisprudence at the time would have given Bedlion clear notice that his shoving Kyle once to effect Lewis's arrest—albeit forcefully—constituted excessive force in violation of her Fourth Amendment rights.  *Cf. Johnson*, 528 F.3d at 976 ("An officer's act of violence violates the Fourth Amendment's prohibition against unreasonable seizures if it furthers *no* governmental interest, such as apprehending a suspect or protecting an officer or the public." (emphasis added)).

In short, where, as here, the law does not clearly proscribe the ostensibly prohibited conduct, an officer is entitled to qualified immunity. *See Messerschmidt*, 132 S. Ct. at 1245. This is not to suggest that Kyle needs to identify a specific case with facts that mirror her own in order to prevail. *See Brousseau v. Haugen*, 543 U.S. 194, 198–99 (2004) (explaining that in the "obvious case, the[] standards can clearly establish the answer, even without a body of relevant case law" (internal quotation marks omitted) (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)). But in this instance, the governing standards do not clearly dictate the outcome when applied to these facts, and Kyle "has not cited any case, and the Court has found none, that reasonably would have placed [Defendant] on notice that her limited restraint of plaintiff's movement . . . violated a clearly established right[.]" *Muhammad*, 881 F. Supp. 2d at 122. Therefore, Bedlion is entitled to qualified immunity on Kyle's excessive-force claim.

## B. Bedlion And Davis Cannot Be Held Liable For False Arrest, Even If There Was No Probable Cause To Arrest Kyle Under These Circumstances

Kyle's false-arrest claim is subject to a similar analysis. To overcome the qualified-immunity hurdle with respect to the false-arrest claim, Kyle must be able to show that her arrest was objectively unreasonable because there was no probable cause to arrest her (*i.e.*, that her arrest violated the Fourth Amendment), and also that established law so clearly precluded a reasonable officer from believing that he had probable cause to arrest her for APO that the arrest decision here could be explained only by incompetence or bad faith. *See Al-Kidd*, 131 S. Ct. at 2085. There is no question that police officers "who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity[,]" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson*, 483 U.S. at 641), and this limitation on liability "applies

22

regardless of whether the . . . error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact[,]" *Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted).  With respect to the qualified-immunity contention relating to the false-arrest claim in the instant case, this Court has opted to examine the state of APO law at the time of Kyle's arrest to determine whether it was clearly established that Bedlion and Davis lacked probable cause to arrest Kyle for APO—*i.e.*, prong two of the applicable immunity doctrine.

      1.    <u>It Was Not Clearly Established That Bedlion Lacked</u>
              <u>Probable Cause To Order Kyle Arrested</u>

      D.C.'s APO statute directs that anyone who, "without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of[] or while that law enforcement officer is engaged in the performance of his or her official duties shall be guilty of a misdemeanor[.]"  D.C. Code § 22-405(b).  D.C. courts have explained that, to "constitute an offense under [the APO statute], a person's conduct must go beyond speech and mere passive resistance or avoidance, and cross the line into active confrontation, obstruction or other action directed against an officer's performance in the line of duty."  *Howard v. United States*, 966 A.2d 854, 856 (D.C. 2009) (alteration in original) (quoting *In re C.L.D.*, 739 A.2d 353, 357 (D.C. 1999)).  The "key is the active and oppositional nature of the conduct for the purpose of thwarting a police officer in his or her duties."  *Id.* (quoting *C.L.D.*, 739 A.2d at 357); *see also Coghill v. United States*, 982 A.2d 802, 806 (D.C. 2009) (same) (citing *Dolson v. United States*, 948 A.2d 1193, 1202 (D.C. 2008)).  That said, the statute is not a specific-intent statute; the phrase "for the purpose of thwarting a police officer" merely "indicate[s] that such conduct must be *directed against* police

officers," and not that the person acted with the specific intent to thwart the officer. *In re J.S.*, 19 A.3d 328, 333 (D.C. 2011) (emphasis in original) (citation omitted). Thus, "despite its breadth," the APO statute "does not criminalize every refusal to submit to a police officer or every prevention or hindrance of an officer in his duties." *Id.* at 331 (internal quotation marks and citation omitted).

Notably, for the purpose of the instant qualified-immunity determination, this Court is disclaiming any duty to begin its analysis by answering the question of whether or not there was actually probable cause to arrest Kyle under these circumstances. The legal issue of whether or not Bedlion and Davis "had sufficient information to support a reasonable belief" that Kyle had committed or was committing the APO crime, *Rice v. District of Columbia*, 774 F. Supp. 2d 18, 22 (D.D.C. 2011), is prong one of the qualified-immunity test, which the Supreme Court has explained need not be addressed first, *see Pearson*, 555 U.S. at 236. The Court here aims its focus on prong two, and thus has evaluated what courts interpreting D.C. law have said about the reach of the APO statute's "active and oppositional" standard in order to determine whether, even assuming that there was not probable cause to arrest Kyle, the lack of probable cause under the circumstances presented here was so clearly established that Bedlion and Davis would have had fair notice of its absence.

This Court has not found any case that is entirely on all fours with the undisputed facts of Kyle's arrest, but there are cases from the D.C. Court of Appeals construing the APO statute (in the context of post-conviction challenges to the sufficiency of the evidence) that are important and instructive. For example, in *In re C.L.D.*, the D.C. Court of Appeals interpreted the APO statute and explained that

refusing to identify oneself, cursing at the police officer, and walking away despite the officer's instruction to remain was an insufficient basis upon which to rest an APO conviction.  739 A.2d at 354.  Similarly, in *Howard v. United States*, the D.C. Court of Appeals reversed an APO conviction that was based solely on the defendant's "refus[al] to take her hands out of her pockets" despite a concededly lawful request to do so, and the court also rejected the argument that the defendant's disobedience "'interfered' with the officer's performance of his duties by heightening his concern for his own safety and thus making it more difficult to sort out and calm a noisy confrontation."  966 A.2d at 855–56.  But even as D.C.'s highest court has rejected the conclusion that the APO statute was violated under those circumstances, it has affirmed convictions for APO (effectively holding that probable cause existed *a fortiori*) in other circumstances that might reasonably resonate with an officer who was observing Kyle's conduct, such as when the accused person's actions consisted of shutting and holding closed a gate in order to prevent an officer from entering an apartment, *see Dolson*, 948 A.2d at 1195, 1202–03; and when the defendant proceeded to "swing[] [his] arm forward" to prevent being handcuffed, *J.S.*, 19 A.3d at 329 (internal quotation marks omitted); and when a defendant, among other things, "brac[ed] himself in [his] car and resist[ed] being removed[,]" *Coghill*, 982 A.2d at 806.

Cases such as these demonstrate the fuzzy parameters of D.C.'s APO crime, and the question for this Court is whether the jurisprudence related to when an APO violation has occurred clearly establishes that Bedlion and Davis did *not* have probable cause to arrest Kyle for committing such a violation under the circumstances presented here.  Notwithstanding Kyle's contentions to the contrary, the mere fact that an APO

violation requires active and oppositional conduct directed at the officer does not plainly resolve this case in her favor, because, in light of the applicable case law, a reasonable officer easily could have interpreted the known facts related to Kyle's conduct to fit into that category.  Recall that, when Bedlion and Davis arrived on the scene to investigate the noise complaint, Bedlion entered the home and Lewis attempted to exit it, which led to a verbal confrontation between Lewis and Bedlion on the porch.  (Undisputed Facts ¶¶ 5–6.)  Kyle *stepped in between them*, with her back to the officer (*see id.* ¶¶ 7, 12), and she covered Lewis's mouth with one hand (*see id.* ¶ 7).  And although Kyle did not touch Bedlion at all (*see* Superior Court Trial Transcript at 45), she was certainly a part of the ensuing commotion once Bedlion deployed his pepper spray (*see* Undisputed Facts ¶¶ 12–13; Kyle's Deposition at 16–17), and she tumbled down the porch steps along with Lewis, who Bedlion was attempting to arrest (*see* Undisputed Facts ¶¶ 14–16).  It is also significant that Bedlion shoved Kyle out of the way before arresting Lewis.  (*See* Kyle's Trial Testimony at 4; Undisputed Facts ¶¶ 14–16; Compl. ¶ 46.)

The plain language of the APO statute is addressed to one who "impedes" an officer, among other things, and the D.C. Court of Appeals has emphasized that in order to commit this crime, the individual's conduct must be "directed against an officer's performance in the line of duty."  *Howard*, 966 A.2d at 856 (internal quotation marks and citation omitted).  It is clear on the instant facts that Kyle had deposited herself in the midst of the melee, and her actions at the very least had the effect of physically blocking Bedlion's access to Lewis, such that, even if Bedlion's decision to arrest Kyle for APO was impermissible, no clearly established law put him on notice that Kyle's

conduct did not constitute that crime.  At the very least, it is certainly not so abundantly clear from the case law that Kyle—who had admittedly interposed herself between the angry officer and her oppositional boyfriend—was *not* impeding Bedlion such that only a police officer who was "plainly incompetent" could have thought otherwise.  *Al-Kidd*, 131 S. Ct. at 2085 (internal quotation marks and citation omitted).  And perhaps even more to the point, because the APO inquiry inherently involves an "intensely factual analysis," *Jones v. United States*, 16 A.3d 966, 971 (D.C. 2011) (internal quotation marks and citation omitted), and, here, no authority clearly placed Kyle's behavior beyond the APO statute's purview, Bedlion lacked sufficient notice that his actions contravened the law, and as a result, he is entitled to qualified immunity.  *Cf. Lyons v. City of Xenia*, 417 F.3d 565, 573, 575 (6th Cir. 2005) (considering an Ohio obstruction statute that required "an affirmative act that interrupt[ed] police business" and observing that it was unnecessary to "determine exactly where Ohio dr[ew] the line on the affirmative-act requirement" to grant qualified immunity on a false-arrest claim).[8]

2.   <u>Davis Reasonably Relied On Bedlion's Determination That<br>There Was Probable Cause To Arrest Kyle</u>

Kyle's failure to show that clearly established law prohibited her arrest for committing the crime of APO under the circumstances presented—and thus that a reasonable police officer would have been on notice that he lacked probable cause to arrest her for that crime—resolves the false-arrest claim against Bedlion, who ordered

---

[8] Kyle's brief in opposition to Defendants' qualified-immunity motion does not establish otherwise. Although she spends some time marshaling probable-cause arguments to support the prong-one conclusion that there was no probable cause in this case, she offers nothing on the clearly established (notice) point beyond the conclusory statement that "[u]nder the governing legal standards [and under Kyle's] version of the facts, the officers involved did not have even arguable probable cause[.]"  (Pl.'s Opp'n at 9.)  This effort falls far short of demonstrating the "controlling authority" or "robust consensus of cases of persuasive authority" that is necessary to deprive the officers here of the cloak of qualified immunity. *Al-Kidd*, 131 S. Ct. at 2084 (internal quotation marks and citation omitted).

the arrest.  But Kyle has also pressed a separate false-arrest claim against Officer Davis, who was the actual arresting officer, and who relied on Bedlion's direction to arrest Kyle, lacking firsthand knowledge of the events on the porch.  (*See* Undisputed Facts ¶¶ 19–20 (noting that Davis "had been in the police car running criminal background[] checks"); Compl. ¶ 47 (indicating that Davis "returned from her car" after Bedlion pushed Kyle).)  In this regard, Kyle asserts that "[t]he other defendants [including Davis] *knew* that Sgt. Bedlion lacked probable cause to have Ms. Kyle arrested but arrested her anyway" (Compl. ¶ 165 (emphasis added)); however, the same lack of notice that shields Bedlion from liability for his alleged mistake regarding the existence of probable cause would also apply to Davis, who would have relied on that same body of case law to evaluate Bedlion's determination that probable cause existed.[9]

Furthermore, under the collective-knowledge doctrine, an arresting officer need not have "sufficient firsthand knowledge to constitute probable cause"; it suffices if "the police officer initiating the chain of communication . . . had firsthand knowledge[.]"  *Reiver v. District of Columbia*, 925 F. Supp. 2d 1, 11 (D.D.C. 2013) (alterations in original) (quoting *Daniels v. United States*, 393 F.2d 359, 361 (D.C. Cir. 1968) (internal quotation marks omitted)).  Moreover, officers who make an arrest based on another officer's first-hand knowledge "remain entitled to the protections of qualified immunity if it was objectively reasonable" to rely on the other officer's word

---

[9] If Kyle means to argue that—notwithstanding any probable cause—Davis acted unconstitutionally because she effected the arrest with the goal of covering up Bedlion's allegedly improper behavior (*see, e.g.*, Compl. ¶ 165), it is axiomatic that the "actual motivations of individual officers" are inapposite and that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Arkansas v. Sullivan*, 532 U.S. 769, 771–72 (2001) (alteration in original) (internal quotation marks omitted) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).  No claim can arise from any alleged nefarious purpose on Davis's part, and in any event, this argument is entirely undeveloped in Kyle's briefing.

"under the circumstances." *Bolger*, 608 F. Supp. 2d at 24 (citing, *inter alia*, *Barham v. Salazar*, 556 F.3d 844, 850 (D.C. Cir. 2009)); *see also Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 216 (D.D.C. 2010).

Here, Kyle suggests that Davis should be held liable independently of Bedlion, presumably on the grounds that she "possessed information at the time that would tend to undermine the existence of probable cause[,]" *Bolger*, 608 F. Supp. 2d at 24, but Kyle fails to identify such information, or to point to a case that would have fairly notified Davis that she was not entitled to rely on Bedlion's decision, and this Court is aware of none.  Indeed, existing case law suggests the opposite.  *See Muhammad*, 881 F. Supp. 2d at 122 ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for [her] actions exists[.]" (first alteration in original) (internal quotation marks and citation omitted)).  Thus, Davis, too, is entitled to qualified immunity.

### C.    The Court Declines To Exercise Jurisdiction Over Kyle's Not-Conceded State-Law Claims

Having concluded that Bedlion and Davis are entitled to qualified immunity based on the lack of fair notice that their conduct when seizing Kyle and ultimately arresting her violated the law, this Court notes that the only claims that remain are state-law claims; specifically, (1) the false-arrest and false-imprisonment claims against Bedlion and Davis (Count One), (2) the assault-and-battery claim against Bedlion (Count Two), and (3) the abuse-of-process claim against Bedlion, Davis, Rubin, and Gamm (Count Four).[10]  This Court had jurisdiction over these claims when this action

---

[10] The defendants listed here are those remaining in light of Kyle's concessions.  (*See* Pl.'s Opp'n at 2.)

was filed because they formed "part of the same case or controversy" as the federal claims over which it had original jurisdiction.  28 U.S.C. § 1367(a).  However, now that the federal claims must be dismissed, the Court has authority to "decline to exercise supplemental jurisdiction" over the state-law claims.  *Id.* § 1367(c)(3); *Robinson v. Pezzat*, 83 F. Supp. 3d 258, 270 (D.D.C. 2015) ("Supplemental jurisdiction is not obligatory[.]" (citation omitted)).

General equitable factors guide the decision whether to exercise supplemental jurisdiction, "including 'judicial economy, convenience, fairness, and comity.'" *Robinson*, 83 F. Supp. 3d at 270 (quoting *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005)).  As courts have noted, in the "usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014) (alteration in original) (quoting *Shekoyan*, 409 F.3d at 424) (internal quotation marks omitted)).  And the D.C. Circuit has cautioned that the Court has "an obligation to exercise its discretion to remand the case to the District of Columbia courts once the federal question, like Elvis, ha[s] left the building."  *Id.* at 418–19.

In light of that directive, and also because the state-law claims raise some unique issues—*e.g.*, Kyle's assault-and-battery claim is premised in part on Bedlion's shove but it also contends that the officer's pepper spray was unlawful—the Court will dismiss the remaining state-law claims without prejudice.  As other courts have noted, no unfairness attaches to that decision, because section 1367(d) of Title 28 of the

United States Code "tolls the statute of limitations during the pendency of the federal case and for at least 30 days thereafter."  *Robinson*, 83 F. Supp. 3d at 271 (citation omitted).

## IV.    CONCLUSION

Because any Fourth Amendment violation that may have occurred under the circumstances presented in this case was not clearly established at the time of the officers' conduct such that they would have had fair notice that their conduct violated the law, Defendants are entitled to qualified immunity and thus summary judgment must be entered in their favor with respect to Plaintiff's constitutional claims. Furthermore, in the absence of any valid claim under federal law, this Court declines to exercise pendent jurisdiction over the remaining state-law claims.  Accordingly, and as provided in the accompanying Order, Defendants' motion for summary judgment will be **GRANTED** with respect to the section 1983 excessive-force and false-arrest claims (Counts Six and Seven) and judgment will be entered in Defendants' favor on those counts.  The claims that Kyle has conceded (Counts Three, Five, and Eight in full, and Counts One and Six with respect to Rubin and Gamm) will be **DISMISSED WITH PREJUDICE**, and the remaining state-law claims (Counts Two and Four, and Count One with respect to Bedlion and Davis) will be **DISMISSED WITHOUT PREJUDICE**.[11]

DATE: March 31, 2016

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

---

[11] The dismissals with prejudice follow from Plaintiff's consent to their dismissal.  *See Grissom v. District of Columbia*, 853 F. Supp. 2d 118, 125 (D.D.C. 2012) (dismissing conceded claim with prejudice).